# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
October 12, 2011 Session

## KATHRYN A. DUKE v. HAROLD W. DUKE, III

**Appeal from the Chancery Court for Williamson County**
**No. 33519     Timothy L. Easter, Chancellor**

---

**No. M2009-02401-COA-R3-CV - Filed June 1, 2012**

---

In this divorce action, Father appeals certain provisions of the parenting plan, the award of rehabilitative alimony and award of counsel fees to Wife, and the finding that he was in criminal contempt. Mother appeals the valuation and division of marital assets, the failure of the court to require that payments to Mother be secured, rulings with reference to certain pre-trial matters, and the classification of alimony. We remand the case for further consideration of the amount of Father's annual contributions into the children's educational accounts; we affirm the judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. PATRICIA J. COTTRELL, P.J., M.S., filed an opinion dissenting in part.

Jacqueline B. Dixon and James L. Weatherly, Jr., Nashville, Tennessee, for the Appellant, Harold W. Duke, III.

Helen Sfikas Rogers and Lawrence James Kamm, Nashville, Tennessee, for the Appellee, Kathryn A. Duke.

## OPINION

### PROCEDURAL HISTORY

Kathryn A. Duke ("Mother") and Harold W. Duke, III, ("Father") were married on October 12, 1991; they are the parents of three children who were 11, 9 and 7 at the time of the institution of this proceeding. Father is a physician who is the owner of Emergency Services Network, a business engaged in the operation of emergency departments in

hospitals. Mother is trained and previously worked as a registered nurse; since the birth of the first child on November 11, 1995, she has not had employment outside the home. Mother initiated this action on May 2, 2007 by filing a complaint for legal separation on grounds of irreconcilable differences and inappropriate marital conduct; she amended the complaint to seek a divorce and by adding Father's substance abuse as a ground. Father counterclaimed, seeking a divorce on grounds of irreconcilable differences and inappropriate marital conduct. After what was clearly a contentious process, a six day trial was held.[1] The court thereafter entered decrees granting Mother a divorce on the ground of inappropriate marital conduct; naming Mother primary residential parent; valuing and dividing the marital assets; awarding Mother rehabilitative alimony of $8,000 per month for eight years; finding Father guilty of two counts of contempt; and awarding Mother $309,167.25 in counsel fees.

Both parties appeal certain aspects of the court's rulings. Father articulates his issues as follows:

1. Whether the trial court erred in failing to award Mr. Duke equal parenting time with the minor children under the parenting plan.
2. Whether the trial court erred in ordering Mr. Duke to contribute to educational trusts for the children.
3. Whether the trial court erred in awarding Mrs. Duke rehabilitative alimony of $8,000 per month for eight years.
4. Whether the trial court erred in awarding Mrs. Duke a portion of her attorneys fees.
5. Whether the trial court erred in finding Mr. Duke guilty of two counts of criminal contempt.

Mother states her separate issues thusly:

1. The trial court erred in not awarding Ms. Duke any of her attorney fees, expert witness fees, discretionary costs, and private investigator expenses.
2. The trial court abused its discretion by impeding the discovery process to the point that marital assets remained concealed throughout the pendency of this action.
3. The trial court abused its discretion when it did not uniformly and/or correctly enforce its scheduling orders, which resulted in prejudice to the wife.
4. The trial court erred in failing to correctly value Emergency Services Network, PLLC, which resulted in an inequitable division of assets.

---

[1] The record consists of a 3206 page technical record, 30 transcripts of proceedings and 205 trial exhibits.

5. The trial court erred when it did not secure its award of alimony or installment payments due the wife under the division of assets with liens against Husband's property or with life insurance.

Mother also contends that the court did not err in awarding alimony, but that the award should have been alimony *in futuro*.

**ANALYSIS**

I. Parenting Time

Appellate courts are reluctant to second-guess a trial court's determination regarding parenting schedules. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). It is not the role of the appellate courts to "tweak [parenting plans] . . . in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). Inasmuch as decisions regarding parenting schedules often hinge on subtle factors, such as the parent's demeanor and credibility during the proceedings, a trial court's decision regarding a permanent parenting plan will be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Id.* We review the trial court's factual findings *de novo* upon the record, accompanied by a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

The residential parenting schedule adopted by the court designates Mother as the primary residential parent and provides that the children will spend 285 days per year with her and 80 days per year with Father. Father contends that he should have been awarded equal parenting time and focuses on the evidence of and the court's findings relative to five factors in that regard: (1) the strength, stability and nature of the children's relationships with each parent; (2) the willingness and ability of each parent to facilitate the child's relationship with the other parent; (3) the character, physical and emotional fitness of each parent; (4) the stability, continuity and predictability in each parent's household; and (5) each parent's employment schedule.

Tenn. Code Ann. § 36-6-404 requires that a final decree entered in a divorce case involving minor children include a permanent parenting plan and that the plan include a residential parenting schedule. In determining the schedule, the court is to consider the

factors at Tenn. Code Ann. § 36-6-404(b).[2] In setting a residential parenting schedule no one factor will predominate over another and, in making parenting decisions, the paramount concern of the trial court must be the welfare and the best interest of the children. *See* Tenn. Code Ann. § 36-6-401(a). As we consider Father's argument, therefore, we resist the invitation to carve out the particular factors designated by Father; rather, we look at how the trial court's consideration of each of those factors is supported by evidence and is consistent with the court's findings relative to the factors not specifically identified by Father.

The final decree included numerous findings of fact relevant to parenting issues, particularly findings relative to Father's history of involvement with drugs. While Father takes issue with the court's reliance on specific evidence rather than what he argues is contrary evidence, we have reviewed the record and determined that the court's factual findings are supported by a preponderance of the evidence.[3]

In adopting the residential parenting schedule, the court also discussed at length the factors at Tenn. Code Ann. § 36-4-404(a); the court found some of the factors to be balanced between Father and Mother, some which favored Father, some which favored Mother, and some which were neutral. It is clear that the court weighed Father's drug use and issues related thereto heavily as it considered the parenting plan issues. Specifically, the court held:

> The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child weighs in favor of Wife. Husband is an addict who needs to admit it and start addressing a serious plan of recovery. Until he does, the Court has concerns that he will continue to exercise poor judgment, such as driving with the children while he is under the influence. Husband, like many addicts, has a propensity for stubbornness, arrogance, blame-shifting, resistance to authority and is unable to keep promises. This conduct puts the parties' children at risk.

---

[2] Father bases his contention that the court erred with regard to the parenting schedule on the factors enumerated at Tenn. Code Ann. § 36-6-106(a); the trial court, however, applied the factors at Tenn. Code Ann. § 36-6-404(b) in setting the parenting schedule. There is little substantive difference between the two sets of factors. *See Cain v. Cain*, No. M2006-02250-COA-R3-CV, 2008 WL 2165963, at *5-6 (Tenn. Ct. App. May 16, 2008); *see also Gervais v. Gervais*, M2005-01483-COA-R3-CV, 2006 WL 3258228, at *7 n.9 (Tenn. Ct. App. Nov. 9, 2006) (commenting that many of the factors in the two statutes are "identical" and that there was no issue in that case requiring "reconciliation of any difference."). Our analysis will be based on the statute applied by the trial court.

[3] We do not find it necessary to quote the specific findings of the court in this regard.

Significant also in the court's adoption of the parenting schedule was the following rationale:

> The children have demonstrated over the life of this divorce a need for stability, continuity, and predictability. Meeting these needs favors Wife. Wife offers a more stable home environment for the children in the marital residence where the children grew up. Although Husband has the means to provide a physical structure ever bit as nice (and perhaps more so) as the marital residence, a nice place to live is not what these children need. They need clean, sober, drug free, stable parents that can be counted on. The Court agrees that the current parenting time schedule in place since December 2008 is working best. It is well-established that "children have the best opportunity to thrive when they live in stable environments." [citation omitted]. This schedule appears to be bringing a good measure of stability, continuity, and predictability to the children, which is supported by the evidence.

We find no abuse of discretion in the court's approval of the residential parenting schedule.

We are, however, concerned that, in the event Father is able to pursue recovery from his addiction, as suggested by the court, Mother would contend that his recovery would not constitute a substantial and material change in circumstance pursuant to Tenn. Code Ann. § 36-6-101(a)(2)(B)[4], since his recovery would be reasonably anticipated. These parties have demonstrated a willingness and ability to litigate every nuance of every issue and we have no reason to believe that litigation over the question of whether Father has recovered sufficiently to increase his parenting time would be any less contentious.

---

[4] A residential parenting schedule, once entered by the court, is *res judicata* as to the facts in existence or reasonably foreseeable when the decision was made. *Keisling v. Keisling*, 196 S.W.3d 703, 719 (Tenn. Ct. App. 2005); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999). A party petitioning to change an existing custody order must prove both (1) that a material change of circumstances has occurred and (2) that a change of custody or residential schedule is in the child's best interest. *Kendrick v. Shoemake*, 90 S.W.3d 566, 575 (Tenn. 2002). As to the requirement that the movant show a material change of circumstances, the Tennessee Supreme Court has stated:

> Although there are no bright line rules as to whether a material change in circumstances has occurred after the initial custody determination, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way.

*Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003) (citing *Kendrick*, 90 S.W.3d at 570).

The court found that several of the statutory factors either weighed in favor of Father or were equal between the parties; additionally, as noted, the court had specific concerns relative to his addiction. Inherent in the court's statement regarding Father's plan of recovery is the reasonable anticipation that, with treatment for his addiction, Father's parenting time may be increased. We view Father's recovery as in the children's best interest and encourage him to pursue recovery; in the same way, we encourage Mother to support him in this effort.

The parenting plan we approve in this appeal is *res judicata* as to the facts presently existing. The trial court has performed its responsibility to develop a plan that is in the best interest of the children; in this regard, the court noted that the children "need clean, sober, drug free, stable parents that can be counted on." When Father successfully pursues recovery and seeks to modify the parenting plan, any litigation that unduly delays the court reaching a plan or modification that is in the children's best interest should be avoided. The fact that his recovery is reasonably anticipated is one factor that is required to be considered in determining whether there has been a material change in his circumstance; that factor, standing alone, should not prevent the court from granting an otherwise meritorius request.

## II. Contribution to Educational Trusts

The court ordered that Father establish an educational trust for each child, into which he is to contribute $15,000 annually for each of two of the children and $20,000 annually for the third child. While Father acknowledges the court's discretion to order that the trust be established and funded,[5] he contends that the amount of yearly contributions results in balances which are "far in excess of even an expensive education," inequitable, and beyond the amounts contemplated by the Child Support Guidelines. He further argues that, since he had previously established an account for each of the children which is greater than cost of an education at the University of Tennessee, the children's post-high school educational expenses should be paid from that account.

The record shows that Father is the custodian of certain accounts at Stern Agee, which he referred to as "UTMA, 'Uniform Transfer to Minor Act'" accounts, in the name of each of the children which were established prior to the institution of the divorce proceedings. Although Father testified that the accounts are for the college educations of each child, the record is not clear that the accounts are limited to that purpose or that the accounts are what the court intended when it ordered that the educational trusts be established. The order to establish the educational accounts does not give the basis upon which the amount of the

---

[5] Our Supreme Court in *Nash v. Mulle*, 846 S.W.2d 803 (Tenn. 1993), held that a court has discretion, in an appropriate circumstance, to order that such trusts be established.

annual contribution was determined, and neither party has cited evidence in the record of the anticipated cost of a college education for the children.

While the trial court acted within its discretion in ordering the accounts established, the evidence does not support the amount of the annual contributions ordered. Accordingly, we affirm the decision that Father establish educational accounts for each of the children[6] and remand the case for the court to further consider the amount of the annual contributions. The court may also consider the extent to which the UTMA accounts are presently or can be restricted to provide for the children's education.

III. Alimony

Appellate courts are disinclined to second-guess a trial court's decision regarding spousal support unless it is not supported by the evidence or is contrary to public policy. *Brown v. Brown*, 913 S.W.2d 163, 169 (Tenn. Ct. App. 1994). Trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of support. *See Garfinkel v. Garfinkel*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996). There are no hard and fast rules for spousal support decisions. *Anderton v. Anderton*, 988 S.W.2d 675, 682–83 (Tenn. Ct. App. 1998); *Crain v. Crain*, 925 S.W.2d 232, 233 (Tenn. Ct. App. 1996). Alimony decisions require a careful balancing of the factors in Tenn. Code Ann.§ 36-5-121(i); the two most important factors are the need of the disadvantaged spouse and the obligor's ability to pay. *Varley v. Varley*, 934 S.W.2d 659, 668 (Tenn. Ct. App. 1996).

Our legislature has stated a public policy preference for temporary, rehabilitative spousal support over long-term support. Tenn. Code Ann. § 36-5-121(d)(2). The purpose of rehabilitative support is to afford the disadvantaged spouse an opportunity to acquire or enhance job skills, education, or both in order to enable him or her to be self-sufficient. *Smith v. Smith*, 912 S.W.2d 155, 160 (Tenn. Ct. App. 1995); *Cranford v. Cranford*, 772 S.W.2d 48, 51 (Tenn. Ct. App. 1989).[7] In *Gonsewski v. Gonsewski*, 350 S.W.3d 99 (Tenn.

---

[6] We affirm as well that portion of the October 26, 2009 order providing that funds remaining in either account when each child reaches the age of twenty-five will revert to Father.

[7] An award of rehabilitative alimony is authorized at Tenn. Code Ann. § 36-5-121(e)(1), which defines "rehabilitated" to mean:

> [T]o achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living

(continued...)

2011), our Supreme Court reiterated the legislative preference and reaffirmed the role of appellate courts in reviewing an award of alimony.[8]

The trial court awarded Mother rehabilitative alimony in the amount of $8,000 per month for a period of eight years. In making the award the court discussed the factors at Tenn. Code Ann. § 36-5-121(i) and found:

> In this case, Wife is forty-one years old and has a bachelor's degree in nursing from Vanderbilt University. She worked for seven years as a nurse prior to becoming a stay-at-home mother. Wife is in good mental and physical health and has over twenty able working years ahead of her. The parties' children, ages nine, eleven, and thirteen, are all enrolled full-time in school; therefore, it is not undesirable for Wife to seek employment outside the home. The Court awarded Wife substantial assets in the division of the marital estate in addition to her separate property.
>
> In short, the Court finds that rehabilitation is possible for Wife and based upon the evidence of this case when weighted against the appropriate statutory factors for alimony, Wife is in need and Husband has the ability to pay rehabilitative alimony.
>
> . . . The Court finds that according to the nature of this case and the circumstances of these parties, such an amount for such a term will achieve the intended legislative purposes for alimony payments.

Father does not argue that the evidence does not support the court's finding that Wife can be rehabilitated; rather, relying on *Franklin v. DeKlein-Franklin*, No. E2007-00577-COA-R3-CV, 2008 WL 1901113 (Tenn. Ct. App. April 30, 2008), he contends that, since Mother received $4,600,702 in assets in the division of marital property, she did not demonstrate a need for alimony.

---

[7](...continued)
expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

Tenn. Code Ann. § 36-5-121(e)(1).

[8] "[T]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011) (citing *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006)).

Cognizant of the fact that awards of alimony "hinge on the unique facts of the case and require a careful balancing of the factors in Tenn. Code Ann. § 36-5-101(d)(1)," *Anderton v. Anderton*, 988 S.W.2d 675, 683 (Tenn. Ct. App. 1996), we do not find the holding in *DeKlein-Franklin* dispositive of the issue presented here. The trial court in *DeKlein-Franklin* awarded transitional alimony[9] to the wife who was 64 years old at the time of the decision. On appeal, this court considered the fact that the wife received marital property valued at $2,548,530 and separate property of $318,979 as "particularly relevant" on the issue of whether the wife had demonstrated a need for alimony; we found that there was no material evidence to support a finding that the wife had a need for any type of alimony and reversed the award. *DeKlein-Franklin*, 2008 WL 1901113, at *14. In contrast, the court in this case made a specific finding that Mother could be rehabilitated, a finding not challenged by Father. The fact that Mother received substantial marital assets does not negate the court's finding that she could be rehabilitated or undermine the purpose of an award of rehabilitative alimony; it is merely one of the several factors the court considers in making an award. *See* Tenn. Code Ann. § 36-5-121(i)(7), (8).

In arguing that the award of alimony should be *in futuro*, however, Mother contends that the court's finding that she can be rehabilitated "is not supported by the facts of this case and is contrary to the current law on alimony," and asserts that Father "will continue earning over $1,000,000 per year while [Mother] working as a nurse will not be able to approach earnings of even 10% of Husband's income."

In considering an award of rehabilitative alimony in accordance with Tenn. Code Ann. § 36-5-121(e)(1), the focus is on increasing the disadvantaged spouse's earning capacity; inherent in the statutory framework is the expectation that the disadvantaged spouse has suffered a loss of earning capacity during the marriage and that, with training or education, the earning capacity of that spouse can be increased. Consistent with the holding of *Gonsewski* that alimony *in futuro* should only be awarded when rehabilitation is not feasible and long term support is necessary, the fact that Father may earn more than Mother in the future, when considered with the other statutory factors, fails to support either a conclusion that rehabilitation is not feasible or that long term support is necessary. *See Gonsewski*, 350 S.W.3d at 109. The post-rehabilitation standard of living is designated in the statute to be "reasonably comparable" to that enjoyed by the other spouse; a potential difference in earnings between the spouses does not, standing alone, support a conclusion that the post-rehabilitation standard of living is not reasonably comparable. In addition, while it is true that the disadvantaged spouse's need and the obligor spouse's ability to pay are the most

---

[9] An award of transitional alimony is appropriate "when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce. . . ." Tenn. Code Ann. § 36-5-121(g)(1).

important factors in considering an award, the "need" to be met in considering an award of rehabilitative alimony is the need to be rehabilitated to increase earning capacity and to be assisted in the rehabilitation, not a perceived "need" to reach parity with the obligor spouse.

The evidence does not preponderate against the court's determination that Mother can be rehabilitated in such a manner that she can return to the workforce at an increased earning capacity and that, with rehabilitation, her post-divorce standard of living will be reasonably comparable to the standard of living both parties enjoyed prior to the divorce and that of Father after the divorce. The award is not contrary to public policy and is within the discretion vested in the trial court. Neither party has otherwise challenged the amount or duration of the award of rehabilitative alimony. We affirm the award of alimony in all respects.

## IV. Valuation of Emergency Services Network, PLLC

The court found that the primary marital asset was Emergency Services Network ("ESN"), a company which provides for the operation of emergency departments in hospitals; ESN was started by Father in 2003 and is owned 100% by Father and Mother. Adopting the opinion of Gerald LeCroy, Father's business valuation expert, the court determined the value of ESN to be $5.4 million. Mother challenges Mr. LeCroy's methodology in arriving at the value, as well as his opinion of value, and argues that ESN's value is $11.9 Million, as testified to by her expert, Kurt Myers.

In its Findings of Fact and Conclusions of Law, the trial court explained its adoption of Mr. LeCroy's valuation in preference to that of Mr. Myers:

> The evidence presented by Myers and LeCroy demonstrates a large disparity in their respective opinions as to the FMV of ESN. Myers places the value at $11.9 million while LeCroy values the company at $5.4 million.
>
> In reaching his determination, Myers gave more weight to the income approach (85%) than the market approach (15%). He gave no weight to the net asset approach stating that "ESN does not have an intangible value often found in professional services entities because the intangible value is often attributed solely to the presence of the professional providing the services." Myers observed that Husband provides virtually none of the professional services. Husband is in the role of CEO who could easily be replaced by a number of highly qualified individuals in the Nashville employment market. Husband sees no patients at the emergency room facilities and therefore ESN has a collection of intangible assets that comprise the intangible value that is not related to any personal goodwill of Husband, according to Myers.

-10-

In reaching his income approach conclusions, Myers considered many subjective factors that are accepted in his profession to arrive at a value. These factors included the capitalized cash flow, the company growth rates, the company's ongoing earnings capacity and the determination of capitalization and discount rates. He reached the conclusion that in employing the income approach the appropriate capitalization rate that should be used for ESN is estimated at 18.1 percent.

LeCroy relied principally upon the income approach and net asset value method. After considering the capitalized earnings method he concluded that the appropriate capitalization rate to be used for ESN is 26.8 percent. As a result of his calculations, LeCroy concluded that the income approach rendered a value of $5.5 million.

In applying the net asset value method, LeCroy found the significant intangible assets of ESN to include the emergency services agreements with three hospitals, employment agreements with physicians, physician assistants, and nurse practitioners and internally developed software. Excluding the goodwill of Husband from ESN, he found the net asset value method rendered a value of $5.3 million.

In reaching his final estimated value of ESN, LeCroy stated that the most significant risk to a hypothetical buyer of ESN is the likelihood of loss of services of existing management and the absence of an employment or non-compete agreement with Husband. LeCroy averaged the two methods (the net asset value approach and the income approach), and concluded the FMV of ESN to be $5.4 million.

The court then proceeded to discuss the differences in each expert's methodologies and calculations of value and concluded:

After a careful consideration of the Myers and LeCroy reports, as well as the Wolff opinion of the two reports,[10] the Court finds that the blend of the

_____

[10] Laroy Wolff, Jr., is a business valuation expert engaged by Husband to review and analyze the valuations of the business performed by Mr. Myers and Mr. LeCroy and to "describe which report was more representative of the fair market value of the Company and state reasons and/or differences between the reports that led to my decision." After reviewing the reports, as well as other related information, including the depositions of Mr. Myers and Mr. LeCroy, Mr. Wolff opined:

Based on my readings of both reports, I believe that the value of the Company as calculated by Mr. LeCroy is more representative of the fair market value of the Company as of April 30, 2008. I believe that Mr. Myers' calculation of the fair market value of the Company as of April 30, 2008 is substantially overstated. As noted in sections above, I

(continued...)

-11-

income approach and the net asset approach as applied by LeCroy to the unique circumstances of ESN is the appropriate formula to reach a FMV of this asset. Although he does not have the professional goodwill a treating physician would have in his practice of medicine, a willing buyer could not ignore the ties, or professional/personal goodwill, of Husband to the ongoing success of ESN. Husband's future relationship with the company, among other things, creates a unique circumstance that would devalue ESN to a hypothetical buyer. *York v. York*, 1992 WL 181710 (Tenn. Ct. App. March 20, 1992).

In *Inzer v. Inzer*, No. M2008-00222-COA-R3-CV, 2009 WL 2263818 (Tenn. Ct. App. July 28, 2009), this Court discussed valuation of a business entity as a marital asset as well as the standard of review we apply to a trial court's valuation:

The value of marital property is a question of fact. *Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct . App. 2007). As fact finder, the trial court is free to place a value on a marital asset that is within the range of the evidence presented. *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App .1987). A trial court's valuation and distribution of a marital asset will therefore be given great weight on appeal and will not be overturned unless the evidence preponderates against those findings or they are inconsistent with the factors outlined in Tenn. Code Ann. § 36-4-121(c). *Owens*, 241 S.W.3d at 486; *Kinard v. Kinard,* 986 S.W.2d 220, 231 (Tenn. Ct. App.1998).

The subject business is a limited liability corporation, a type of entity that is akin to a closely held corporation for purposes of valuing it as a marital asset. *Powell v. Powell*, 124 S.W.3d 100, 104 (Tenn. Ct. App. 2003). While there are several acceptable methods used to calculate the value of a corporation, it is particularly important in this case to note that "determining the value of a closely held corporation is not an exact science. . . ." *Wright v. Quillen*, 909 S.W.2d 804, 809 (Tenn. Ct. App. 1995) (citing *Wallace*, 733 S.W.2d at 107).

---

[10](...continued)
believe Mr. Myers, among other things, did not fully consider the implication of the risk of the contracts in his calculations. I also believe he did not consider the reasonableness of $10,465,000 of calculated intangible asset value given that the contracts are cancellable with [sic] 180 days without cause, cancellable immediately in certain circumstances, subject to forced amendment, tied to Dr. Duke personally and non-transferable without permission from the facility (which they do not have to give) and the fact that Dr. Duke does not have a noncompete/employment agreement with the company and is under no obligation to sign a noncompete/employment agreement.

Our Supreme Court recognized three of these methodologies: (1) the market value method, (2) the asset value method, and (3) the earnings value or capitalization of earnings method. *Blasingame v. Am. Materials, Inc.,* 654 S.W.2d 659, 666 (Tenn.1983), *superceded on other grounds by* Tenn.Code Ann. § 47-8-102 (1992 Repl. & Supp.1998).

*Inzer*, 2009 WL 2263818 at *4.[11]

The evidence of value of ESN, as well as the methodologies employed by the evaluators, was conflicting. As articulated by Mother in her brief on appeal, Mr. Myers utilized different methodologies and factors in reaching his valuation; he also expressed his opinion relative to deficiencies in Mr. LeCroy's valuation analysis. The income and net asset approaches utilized by Mr. LeCroy have been approved by our Supreme Court, and the earnings and expense figures used by him are supported by competent evidence; he was cross-examined relative to many of the matters Mother argues on appeal. The trial court accepted his testimony in preference to that of Mr. Myers. Considering the entire record, the evidence does not preponderate against the opinion of value expressed by Mr. LeCroy. The value set for ESN by the trial court was within the range of values presented by the experts; consequently, the court did not err in determining the value of ESN to be $5.4 million.

Mother also contends that the trial court's adoption of Mr. LeCroy's valuation led to an inequitable division of assets; she does not explain this contention other than with reference to her contentions regarding the valuation, which we have discussed above. After determining the value of ESN, the court divided the asset equally. We find no error in this regard.

---

[11] The methodologies were distinguished as follows:

The market value method establishes the value of the share on the basis of the price for which a share is selling or could be sold to a willing buyer. This method is most reliable where there is an established market for the stock. The asset value method looks to the net assets of the corporation valued as a 'going concern,' each share having a pro rata value of the net assets. The net assets value depends on the real worth of the assets as determined by physical appraisals, accurate inventories, and realistic allowances for depreciation and obsolescence. The investment value method relates to the earning capacity of the corporation and involves an attempt to predict its future income based primarily on its previous earnings record.

*Inzer*, 2009 WL 2263818, at *4 (citing *Blasingame v. Am. Materials, Inc.*, 654 S.W.2d 659, 666 (Tenn. 1983)).

V. Contempt

Mother sought both civil and criminal contempt against Father for seven alleged acts of disobedience to a court order; the court found Father guilty of two counts of criminal contempt. Relying on *McPherson v. McPherson*, No. M2003-02677-COA-R34-CV, 2005 WL 3479630 (Tenn. Ct. App. Dec. 19, 2005), Father contends that the court's conduct of civil and criminal contempt proceedings simultaneously rendered the contempt proceeding "fundamentally flawed," thereby violating his constitutional right against self-incrimination, and that the findings of criminal contempt should, accordingly, be vacated.

The finding of contempt in *McPherson* came in the course of a hearing on several post-trial motions and petitions in which the trial court addressed the father's child support arrearage and the father's alleged failure to comply with other provisions of the marital dissolution agreement and prior court orders. Following the hearing, the court found the father to be in civil contempt and sentenced him to ten days in jail; the court also ordered that he remain in jail after the ten day sentence until he complied with certain conditions. On appeal, this Court reversed the judgment of contempt based on procedural defects in the contempt proceeding. Of particular relevance to the case at bar is the following language:

> The procedure the trial court used to impose this criminal contempt sanction was procedurally defective. Ms. McPherson's April 2003 petition did not state whether she was seeking to hold Mr. McPherson in criminal contempt, civil contempt, or both. The trial court did not see to it that Mr. McPherson received notice as required by Tenn. R. Crim. P. 42(b), and the record contains no evidence that Mr. McPherson was afforded the presumption of innocence or informed of his privilege against self-incrimination. These omissions, together with the absence from the trial court's August 22, 2003 order of an affirmative finding that Mr. McPherson had the ability to make the required payments and willfully failed to do so, require that the portion of the judgment sentencing Mr. McPherson to serve a mandatory ten-day sentence be vacated.

> The trial court committed another error that undermines the portion of its judgment imposing civil contempt sanctions against Mr. McPherson. The trial court, in effect, was conducting a civil contempt proceeding and a criminal contempt proceeding simultaneously. We have pointed out that such proceedings are fundamentally flawed and should be avoided because of the significant differences in the respective burdens of proof and the procedural rights accorded to the persons accused of contempt. *Cooner v. Cooner*, No. 01A01-9701-CV-00021, 1997 WL 625277, at *6-7 (Tenn. Ct. App. Nov. 14, 1997) (No Tenn. R. App. P. 11 application filed). Criminal and civil contempt

-14-

proceedings should be tried separately. *Freeman v. Freeman*, 147 S.W.3d at 243-44. The trial court's failure to separate the proceedings prejudiced Mr. McPherson. Accordingly, the portion of the judgment finding Mr. McPherson in civil contempt must be vacated as well.

*McPherson*, 2005 WL 3479630 at *5 (footnote omitted). *McPherson* disapproved of the trail court's considering civil and criminal contempt simultaneously and cautioned that the proceedings should be tried separately; we did not, however, find that the trial court's joinder of the claims reached the level of constitutional infirmity. After determining that the procedure used to impose the jail term as a sanction was in fact a criminal contempt proceeding, we vacated the judgment in the absence of proof that the father had been afforded certain constitutional protections to which he was entitled.

As in *McPherson*, we do not find a violation of Father's constitutional rights arising from the joinder of civil and criminal contempt claims. Unlike *McPherson*, however, the record before us shows that Father was fully advised of his rights attendant to being charged with criminal contempt, of the factual basis of the charges and that he suffered no prejudice from the joinder. On May 30, 2008 Mother filed a document styled "Wife's Supplemental and Amended Complaint for Legal Separation or Divorce and Petition for Civil and/or Criminal Contempt." In the document, Mother made specific factual allegations relative to Father's asserted violation of the parenting plan and dissipation of marital assets and requested that he be held in criminal contempt. Accompanying the pleading was the notice required by Tenn. R. Crim P. 42(b). On September 11, 2008, Mother filed a document styled "Wife's Supplemental and Second Amended Complaint for Legal Separation or Divorce and Petition for Civil and/or Criminal Contempt," in which additional factual allegations relative to Father's closing of a line of credit, making derogatory comments about Mother in the presence of the children, and harassment of Mother were made; again Mother requested that Father be held in criminal contempt.[12] Father does not assert on appeal that the notice was inadequate or that the evidence does not support the finding of contempt, only that the court erred in considering criminal and civil contempt in the same proceeding.[13] Under the facts

---

[12] The record contains a Tenn. R. Crim. P. 42 notice which was filed on August 8, 2008. It is not clear why the notice was filed before the Second Amended Complaint.

[13] In his Reply Brief, Father contends that "[i]n conducting the civil and contempt trials simultaneously with the divorce proceeding, the trial court violated Mr. Duke's fundamental constitutional right against self-incrimination." While any particular concern Father had to the joinder of the contempt hearing with the divorce proceeding was not raised in his principal brief, we agree with Mother and hold that, under the unique circumstances of this case, the failure of Father to object at the pre-trial conference or in the course of trial amounted to a waiver of his right to self-incrimination.

presented in this case, we find no error in the manner in which the court considered the civil and contempt allegations.

VI. Attorneys Fees

In ruling on Mother's application for an award of fees and expenses, the trial court held in pertinent part:

> Husband has spent $838,844.81 in attorney's fees and expenses to pay for this divorce litigation. . . . These funds came from ESN's coffers. Wife has expended $910,677 in attorney's fees and expenses . . . Wife is seeking reimbursement for her fees and expenses from Husband.
>
> Husband's fees and expenses included $200,936.26 to Kraft CPAs for the preparation of two audits (Exhibits 142, 143, and 144). Additionally, Husband's fees and expenses included $19,574.04 for mediation cost. These expenses benefitted both parties and should be shared expenses. Husband's true individual fees and expenses, which were paid from ESN proceeds, are therefore $618,334.51.
>
> ***
>
> Clearly, Husband has the ability to pay all or a portion of Wife's fees and expenses. The Court has previously found Wife to be the economically disadvantaged spouse.
>
> However, wife does not lack sufficient funds to pay her attorney's fees and expenses since the Court awarded her substantial assets in the division of the marital estate including $800,000.00 in cash and $15,833.33 plus 6% interest per annum per month for ten years from the division of ESN. Likewise, the payment of Wife's attorney's fees and expenses would not require her to deplete her considerable separate financial resources since it is undisputed that she has two SunTrust stock accounts with combined assets totaling $694,003.
>
> The Court finds that the fair answer to Wife's request for attorney's fees and expenses is to require Husband to within 30 days of entry of the Final Decree reimburse Wife $309,167.25 which represents half of the monies Husband removed from ESN funds as his true individual fees and expenses in pursuit of this divorce action. While it is true that Husband's conduct caused the breakup of this marriage, both parties contributed to the especially protracted litigation. [fn. 11] While Husband was initially dishonest about his affair, Wife continued to needlessly conduct laborious and expensive discovery after Husband admitted his transgressions. [fn. 12] For his part, Husband, in addition to initially being untruthful, refused to concede or stipulate to grounds

-16-

for this divorce, resulting in a needlessly elongated final hearing. As a result, each party should be required to pay their own cost and fees from their more than sufficient post divorce liquid assets. *Eldridge v. Eldridge*, 137 S.W.3d. 1 (Tenn. Ct. App. 2002).

[fn. 11.] A review of the Clerk and Master's Case Management System Docket Handler indicates that the parties filed numerous pre-trial motions resulting in some 82 pre-trial Orders many of which were presented to the Court in the form of competing Orders. The pre-trial motions filed included over two dozen pre-trial motions to compel, quash, contempt and sanctions during the months leading up to the final hearing. The vast majority of the pre-trial filings were the Wife's.

[fn. 12.] Husband admitted his affair with Lineberger in May of 2008.

Father contends that, because the trial court found that Mother had adequate resources to pay her attorneys fees, it erred in awarding her a portion of her fees. Mother argues that the $309,167.25 awarded to her was not an award of fees but, rather, constituted an equalization of the division of the marital assets.[14] Mother further argues that she should have been awarded the total of her attorney and expert witness fees, costs and expenses of $910,667.

An award of attorneys fees in a divorce action constitutes alimony *in solido*. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002); *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001); *Herrera*, 944 S.W.2d at 390; *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992); *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992). Such an award is to be based on a consideration of the factors set forth at Tenn. Code Ann. § 36-5-121(i) and is appropriate when the spouse seeking them does not have adequate funds to pay his or her legal expenses. Moreover, the spouse need not use assets provided for future income in the division of marital property to pay the legal expenses. *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000). The award "is conditioned upon a lack of resources to prosecute or defend a suit in good faith." *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983). Accordingly, a spouse with adequate property and/or income is not entitled to be compensated for his or her attorney's fees and expenses. *Wilder*, 66 S.W.3d at 895; *Koja*, 42 S.W.3d at 98; *Lindsey v. Lindsey*, 976 S.W.2d 175, 181 (Tenn. Ct. App. 1997); *Houghland*, 844 S.W.2d at 623–24; *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App.

---

[14] We decline to engage in semantics as to whether the court's award was an equalization of marital assets rather than an award of fees; we determine only whether the court's action was in conformity with the law.

1986). Because an award of attorney fees lies in the discretion of the trial court, we will not reverse an award absent an abuse of that discretion. *Owens v. Owens*, 241 S.W.3d 478, 495 (Tenn. Ct. App. 2007). A trial court abuses its discretion when the evidence does not support the court's decision, when the court applies an incorrect legal standard, or when it reaches a decision that contravenes logic or employs reasoning that causes an injustice to the complaining party. *Id.* at 496.

Tenn. Code Ann. § 36-5-121(i)(8)[15] and the "catchall" provision at § 36-5-121(i)(12)[16] authorize the court to consider the fact that Father used marital assets to pay his fees in making the award to Mother. It was appropriate and equitable to require Father to reimburse Mother for her fees and expenses based on the amount of marital funds he spent for the same purpose.

As to Mother's request for an award of attorneys fees, the court found that, in light of the division of the marital estate as well as her separate property, Mother had sufficient funds and would not be required to deplete her separate resources in order to pay the fees. In its findings and conclusions relative to the division of assets and liabilities, the court found Mother's separate property to be $694,003, held in two accounts at SunTrust Bank. On Mother's motion to alter or amend to include certain debts in the division, the court amended the order dividing marital assets to assign $506,891 in debt to SunTrust Bank to Mother; Mother testified she incurred the debt to pay her attorneys fees.[17] Mother contends that these

---

[15] Tenn. Code Ann. § 36-5-121(i)(8) provides:

(i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
\*\*\*
(8) The provisions made with regard to the marital property, as defined in § 36-4-121;


[16] Tenn. Code Ann. § 36-5-121(i)(12) provides:

(i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
\*\*\*
(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.


[17] This was the only debt the parties had. In its order assigning the debt to Mother, the court noted:

(continued...)

findings were "incorrect" and that she effectively depleted her separate assets because she was "required" to borrow against those assets in order to pay her fees. The evidence does not preponderate against the trial court's findings. Mother received assets valued at $3,906,669.00 in the court's division of marital property; these are funds sufficient to pay her fees without recourse to her separate assets. While Mother takes issue with the court's denial of her application, the facts in support of the court's action are supported by the record.

Considering the entire record in this case, the court did not abuse its discretion in awarding Mother $309,167.25 for the reasons stated in its order; neither did it abuse its discretion in denying Mother's application for an award of fees and expenses totaling $910,667.

VII. Securing Alimony and Installment Payments

In her amended motion to alter or amend the division of assets, Mother requested that Father be ordered to maintain life insurance to secure his monetary obligations to her[18] or that the obligations be otherwise secured; the court denied her request. Mother contends that, in light of Father's "history of substance abuse, and the long-term nature of the payouts for both alimony and the division of assets, the Trial Court erred in failing to secure these obligations."

Tenn. Code Ann. § 36-5-121(l)[19] provides:

(l) To secure the obligation of one party to pay alimony to or for the benefit of the other party, the court may direct a party to designate the other party as the beneficiary of, and to pay the premiums required to maintain, any existing policies insuring the life of a party, or to purchase and pay the premiums required to maintain such new or additional life insurance designating the other party the beneficiary of the insurance, or a combination of these, as the court deems appropriate.

---

[17](...continued)
"The Court remains satisfied that this additional assignment of debt to Wife results in a fair and equitable division of the parties' assets and liabilities."

[18] In addition to paying Mother $8,000 per month in rehabilitative alimony for eight years, the court ordered that Father compensate Mother for her interest in ESN at the rate of $15,833.33 per month for ten years.

[19] This statute was formerly Tenn. Code Ann. § 36-5-121(k) but, as a result of the passage of 2011 Tennessee Laws Pub. Ch. 119, was recodified effective April 25, 2011.

Inasmuch as the statute provides that the court "may" require insurance to secure an award of alimony, we review the court's decision under the abuse of discretion standard.

We have reviewed the transcript of the hearing on both parties' motions to amend the final decree. The court considered the argument of both counsel and determined that "enough is enough." In light of the substantial assets awarded both parties, as well as the amount of life insurance covering Father which was awarded Mother, we are not persuaded that the court abused its discretion in denying the request that Father's obligations be otherwise secured.

VIII. Discovery Matters

Mother contends that the trial court abused its discretion by "impeding the discovery process," as a result of which marital assets were allowed to be concealed by Father and that, as a consequence, all marital asserts were not divided. In her brief, Mother cites three orders of the trial court as demonstrating the court's abuse of discretion. The first order was entered June 3, 2008, following a hearing on Mother's motion for an independent audit of ESN and its related entities; the second was entered September 29, 2008, on a motion Mother filed seeking certain business records; the third was entered October 27, 2008, to quash subpoenas *duces tecum* issued by Mother.

The standards applicable to this Court's review of lower courts' determination of discovery matters was set forth in *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010) as follows:

> Because decisions regarding pretrial discovery are inherently discretionary, they are reviewed using the "abuse of discretion" standard of review. The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the court below . . . or to substitute their discretion for the lower court's. . . . Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its

-20-

decision on a clearly erroneous assessment of the evidence. To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness.

*Lee Med., Inc.*, 312 S.W.3d at 524–25 (internal citations omitted).

As an initial matter, our review of the various discovery orders shows that the court ruled on motions filed relative to matters which counsel for the parties could not resolve between themselves; indeed, Mother does not complain that any discovery matter was not ruled on by the court. The fact that the court may not have ruled in Mother's favor on any particular discovery motion does not lead to a conclusion that the court "impeded" discovery in any respect. As noted earlier, the record in this case shows that this was—to put it mildly—a contentious case; nowhere is this more apparent than in discovery matters. The parties availed themselves of the full panoply of discovery devises and the record is replete with motions befitting of the vigor with which this case was litigated. We have reviewed the record and have the utmost of confidence that the trial court addressed Mother's discovery concerns in a manner consistent with the letter and spirit of the rules governing discovery.

Mother complains that the court struck certain provisions of the June 3 order (which her counsel had prepared) and the effect of the court's action "render[ed] both the business and the personal audits virtually impotent." The June 3 order, with the language stricken by the court, stated:

This matter came on to be heard on May 27, 2008, before the Honorable Timothy Easter, upon Plaintiff's Motion for an Independent audit, statements of counsel for the parties, and the entire record in this cause, from all of which the Court finds as follows:

The parties announced an agreement as follows in regard to the independent audit of Emergency Services Network, PLLC: Emergency Services Network, PLLC and all related affiliates (hereinafter ESN) shall undergo an independent financial statement audit in accordance with Generally

-21-

Accepted Auditing Standards (hereinafter GAAS) to be performed as soon as possible by the accounting firm Kraft CPAs, PLLC. The audit will cover the time period of January 1, 2005, through a date as current as possible in 2008 to be determined by the auditor, and if time permits, the audit will cover the entire time period during which Emergency Services Network, PLLC has operated. **The financial statements should be presented in accordance with Generally Accepted Accounting Principles (GAAP)**. The purpose of the independent financial statement audit will be to provide the parties' respective business valuation experts with audited financial statements ~~and to determine any irregularities~~ and the auditor will not place a value on ESN or any related affiliate. The auditor's work and report shall be completed on or before July 15, 2008. The report shall be released to counsel for both parties simultaneously who shall provide it to their respective experts. The February 22, 2008 scheduling order is modified to provide that all expert witness reports and disclosures will be provided to opposing counsel by July 22, 2008, and prior to the mediation set for July 23, 24 and 25, 2008. The auditors will be subject to the Agreed Protective Order previously entered in this matter. The cost of the audit shall be paid from marital funds. The expert discovery deposition of Jerry LeCroy (Husband's expert) which is currently scheduled for July 2, 2008 at 9:30 a.m., is rescheduled to August 6, 2008, at 9:30 a.m. The expert discovery deposition of Kurt Myers (Wife's expert) which is currently scheduled for July 3, 2008 at 9:30 a.m., is rescheduled to August 7, 2008, at 9:30 a.m. The February 22, 2008 scheduling order is modified to reflect these dates.

In regard to the request for an audit of Defendant's personal accounts contained in Plaintiff's Motion for Independent Audit, the Court finds that such Motion is well taken and is hereby granted as to both parties, with both parties' individual and joint personal accounts and finances to undergo an audit by Kraft CPAs, PLLC, to provide an accounting of income and expenses ~~and to determine whether there are funds that cannot be accounted for~~ from January 1, 2007 through a date as current as possible in 2008 to be determined by the auditor. Wife's separate assets which are held in trust are not subject to this audit, pending further orders of the Court. The audit report on the parties' personal accounts shall be completed and provided to opposing counsel by July 15, 2008, and the costs of the personal audits shall be paid from marital funds.

The order states that it reflected the agreement on Mother's motion for an independent audit of ESN announced to the court on the date of hearing; there is no explanation for the

court's striking of the language.[20] We have reviewed the transcript of the May 27 hearing, however, and note the following colloquy between counsel and the court:

MS. ROGERS [Counsel for Mother]: And we have an agreement that there will be an audit of the books of the corporation by Kraft brothers; that the auditors will have until July 15 to submit their audit report; that our valuation experts will then have their reports ready by July 23 which is when we are going to mediation. And we have bumped the deposition dates for our valuation experts to after the mediation if we're unsuccessful at mediation.

THE COURT: So that takes care of the motion for an audit?

MS. ROGERS: No. Because I have also asked for a motion to personally audit Dr. Duke's accounts, and he is not agreeing to that part of the motion.

* * *

MS. ROGERS: . . . All right. Now, my next motion is for the audit of Dr. Duke's personal returns. And, Your Honor, my client did - -

THE COURT: This is the one you have some partial agreement on?

MS. ROGERS: Right. They have agreed to an audit of the business, but they have not agreed to an audit of Dr. Duke's personal - - of Dr. Duke's personal returns. Let me hand, if I could, to the Court - - this is something that I have done. I'm not an accountant or an expert, but I've just done it to try and understand Dr. Duke's method and what he has done in his bank accounts. Dr. Duke's income in 2006 was 3.7 million and last year was 1.9 million. I have gone through his bank statements from May of 2007 when this divorce was filed through April 2008.

And Dr. Duke will tell you, he operates in cash. And when I'm talking about cash, I'm talking about large amounts of cash. He pays Dr. David McMillan, the parenting coordinator in this case, in cash. He pays his electric bill in cash months in advance. And so what we have, if you'll look at this, Your Honor, is in the 11 months that this case has been pending, Dr. Duke has spent $985,000. And when I say he's done that, you know, some of it did go to my client. My client gets $8,000 a month. But every time Dr. Duke - - and you'll see that in the first set where it says "withdrawals and debits," but then Dr. Duke every time he makes a withdrawal for her withdraws 8,000 in cash. And then he has all of these various online transfers that he makes. And so we really - - you know, in a normal case, I would say it's certainly - - auditing

---

[20] In his Reply Brief, Father contends that the order as submitted by Mother's counsel "was not reflective of the agreement announced at court" and that Mother's counsel "expanded the parties' agreement."

someone's personal accounts and trying to find out what's gone on would not be very productive. But in this case, I think we're talking about fairly substantial amounts of money. Dr. Duke has, you know, either in - - it's somewhere in some other account or someone is holding it for him or something. Something doesn't add up here. And it doesn't take a genius to look at these numbers and withdrawals to understand that something is just not right here.

* * *

THE COURT: The Court is going to grant the motion, but it is going to be a mutual order that both parties submit to a personal audit on the returns. And it seems to make sense that Kraft Brothers do this as well since they're doing the other. I want both parties to cooperate with that personal audit on their returns. Can you prepare that order please, Ms. Rogers?

The order, as modified by the court, reflected the agreement announced in court, as well as requiring the parties' individual returns to be audited.

The colloquy also shows that Mother put her concerns regarding the marital funds, which she contended were not being accounted for due to Father's reliance on cash transactions, before the court. Counsel for Father also addressed the court in response to Mother's argument. The June 3 order reflects that the audits were to be provided to the parties and their expert witnesses and there is no complaint that any information was lacking for Mother's expert to express an opinion on any matter. The record does not support Mother's contention that the court abused its discretion in striking the particular language.

The motion upon which the September 29 order was based requested that Father be compelled to provide business records for Emergency Physicians of Portland, LLC, "RTI reports for Skyline, Gateway and Jennie Stuart," and the May, June and July 2008 financial statements for ESN for purposes of completing the audit referenced in the June 3 order. The September 29 order required Father to provide, on a monthly basis, information which comprised the monthly ESN financial statements report. Again, the record does not contain any evidence that the information provided was lacking in any respect relative to the issues in the case; specifically, there is no basis in the record for us to conclude that the information ordered to be provided did not show the "real numbers" of ESN.[21]

---

[21] Records relative to Skyline, Gateway and Jennie Stuart were the subject of the October 27 order.

The October 27 order was entered on motions to quash the subpoenas issued to ESN, Mark Green and Robert Moskowitz[22]; in granting the motions, the order held that "the discovery requested by Plaintiff would be cumulative, duplicative and unduly burdensome and expensive." At the hearing on the motions, the court ruled:

> THE COURT: - - Mr. Welborn on behalf of the company, ESN, I'm satisfied that my previous ruling was sufficient to give Ms. Rogers at least enough to create a finding that the discovery provisions of Rule 26 have been met and any additional information would just be cumbersome and duplicative and unreasonably burdensome. So the motions to quash are granted as well.
>
> I'm satisfied that the experts that have already had their fingers in this pie have sufficient information to give the Court an idea of the valuation or if that valuation is somehow flawed based upon irregularities either at Portland or anywhere else that you want to try to point out at trial, Ms. Rogers.
>
> And, then again, I may get to the end of the proof and say, You know, you were right back in October when you made the suggestion of a special master. And I'll cross that bridge then. I'm just afraid now, though, because of the delay and the cost involved that it's not a good idea.
>
> So, to repeat, just so we're clear, Mr. Wellington [sic], your motion to quash those two subpoenas is granted.
>
> Your motion for special master in the form of David Wood, of Lattimer, Black & Cain, is denied.
>
> But, Mr. Wellington [sic], you and ESN need to make sure those monthly reports still get in the hands of Ms. Rogers, the monthly reports that we talked about back in September.
>
> All right. Mr. Wellington [sic], can you prepare your order?

The order also provided that "per the agreement by Dr. Duke and ESN at the hearing, ESN will produce to Plaintiff until the trial of this matter monthly reports from RTI for the Skyway, Gateway and Jenny Stuart facilities."

The main marital asset was ESN and the orders referenced above were designed to get the best financial information to the appropriate people to value that asset. There was no abuse of discretion in the court's handling of the discovery leading to the valuation of ESN and its related entities.[23]

---

[22] Mark Green was the Chief Operating Officer of ESN and Robert Moskowitz was the ESN Medical Director. The motions to quash their subpoenas had been filed by Attorney Joseph Welborn.

[23] Mother argues that the court quashed the subpoenas pursuant to Tenn. R. Civ. P. 26.02, governing

(continued...)

Mother argues that at least $3,823,663 in marital funds was unaccounted for at the time of trial. In reaching this figure, Mother takes the parties' after tax income for the years 2004–2008 of $6,437,005 and reduces that amount by what she asserts is the total value of marital assets of $1,958,542, four years of support at $8,000 per month paid by Father to Mother, and the children's tuition for years 2003–2004 through 2008–2009. We do not agree that the difference in the referenced figures, standing alone, proves or even suggests that marital assets were being concealed and Mother has failed to articulate a logic to lead us to that conclusion. The figures upon which Mother bases her argument include years prior to the institution of the divorce proceeding, are speculative and are based, in large part, on facts and assumptions not reflected in the record. The record does contain substantial testimony and argument of counsel for both parties relative to the spending proclivities of Mother and Father (both prior to and during the divorce proceeding), the substantial tax liability Father's high income generated, the children's school tuition and other expenditures. Further, the trial court considered Mother's contention that Father dissipated marital assets and found that Father dissipated $22,059[24]; Mother does not assign specific error with the court's finding and order that Father pay Mother that amount.

The trial court did not abuse its discretion in its handling of discovery matters.

IX. Scheduling Matters

Mother contends that the trial court abused its discretion when it did not uniformly and/or correctly enforce its scheduling orders; specifically, she complains that the court erred in excluding the testimony of David Wood, an accountant who was engaged by Mother to review the valuation reports, work papers and depositions of Mr. LeCroy and Mr. Myers and render an opinion on the valuation of ESN.

At a hearing on Mother's motion to use Mr. Wood as an expert witness held on March 3, 2009, the court heard arguments of both counsel and ruled as follows:

> THE COURT: Basically the Court's main concern on all of these experts is that they have properly - - they were properly disclosed to the

---

[23](...continued)
discovery scope and limits, rather than Tenn. R. Civ. P. 45.07. We find no error in the court exercising its general supervisory authority under Rule 26.02(1) to quash the subpoenas, which accompanied notices of depositions of the persons subpoenaed.

[24] In its ruling on the issue of dissipation of marital assets, the court gave due consideration to Father's lack of credibility.

opposing side, the opposing side was given an opportunity to take whatever discovery they wanted to take, including depositions.

> And based upon the statements that have been made here this afternoon regarding the two experts in question, both David Wood and LeRoy Wolfe, the court is satisfied that at least in the case of Mr. Wolfe there have been - - there has been no violation of any discovery deadline order. So the motion in limine and to quash husband's expert witness report of LeRoy Wolfe, Jr., is denied and Mr. Wolfe will be allowed to testify and tell the court whatever it is he thinks his expertise merits and the court will give it whatever weight, if any, the court thinks its entitled.

> Based upon statements made by counsel, the court is satisfied that the proposed expert David Wood was not disclosed and properly - - failed to meet the discovery schedule previously imposed by the court and so, therefore, the court is going to exclude the testimony of David Wood. So that motion - - to clarify - - I hope I've clarified it. I'll be clear as I can. He's not going to testify.

> The three experts that I anticipate hearing from, therefore, will be Gerald LeCroy, Kurt Myers, and LeRoy Wolfe, and those will be the three that the court is satisfied has met all the discovery, scheduling deadlines, and are properly ready to be presented to the court for their testimony and for the court to give it whatever weight that it might. So you have got three. That should be more than enough, I would think. . . .

The court entered an order memorializing the ruling.

Tennessee's trial courts possess broad discretionary authority to control their dockets and the proceedings in their courts, *Hessmer v. Hessmer*, 138 S.W.3d 901, 904 (Tenn. Ct. App. 2003), and reviewing courts will second-guess the exercise of such discretion only when the court has acted unreasonably, arbitrarily, or unconscionably. *Hodges v. Attorney Gen.*, 43 S.W.3d 918, 921 (Tenn. Ct. App. 2000). The court's ruling relative to Mr. Wood was made in furtherance of its adherence to the scheduling order. Prior to ruling that Mr. Wood would not be able to testify, the court determined that Mother would have a witness to testify as to the valuation of ESN. The court also considered the arguments Mother makes on appeal. We find no abuse of the court's discretion in its exclusion of Mr. Wood as an expert witness.

-27-

## CONCLUSION

For the foregoing reasons, we remand the case for further consideration of the amount of Father's annual contributions into the children's educational accounts; in all other respects the judgment of the court is AFFIRMED.

_____
RICHARD H. DINKINS, JUDGE